JACKSON LEWIS P.C.
Paul T. Trimmer, Nev. Bar No. 9291
3800 Howard Hughes Pkwy., Suite 600
Las Vegas, NV 89169
Tel:  (702) 921-2460
trimmerp@jacksonlewis.com
Veronica T. von Grabow, *pro hac vice*
950 17th Street, Suite 2600
Denver, CO 80202
Tel:  (303) 225-2419
Veronica.vonGrabow@jacksonlewis.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| CARIENE CADENA; ANDREW GONZALES,<br><br>Plaintiffs,<br><br>vs.<br><br>CUSTOMER CONNEXX LLC; ARCA INC.,<br><br>Defendants. | Case No.: 2:18-cv-233- APG-DJA<br><br>**DEFENDANT'S MOTION FOR DECERTIFICATION AND SUPPORTING MEMORANDUM** |

## I.    INTRODUCTION

Plaintiffs allege they are owed overtime wages for time spent booting up and down their computers and other activities at the start and end of their shift. Their FLSA claims were conditionally certified under a lenient, pre-discovery standard. Now, post-discovery, the Court closely scrutinizes whether Plaintiffs are "similarly situated." The developed record shows that Plaintiffs were not subject to any uniform policy that violated the FLSA. To the contrary, there is voluminous evidence, including testimony from most Plaintiffs, that their employer prohibited off-the-clock work and had robust procedures to ensure that employees were paid fully. Further, with respect to the dispositive issues, there are serious factual differences among Plaintiffs. Under these circumstances, Plaintiffs cannot satisfy the stricter standard and decertification is proper.

## II.   BACKGROUND

### A.  Factual Background

Customer Connexx LLC ("Connexx") operates a call center in Las Vegas (the "Call Center") that performs customer service and scheduling for an appliance recycling business. ECF No. 25-22, Kamaka Decl. ¶3. Since November 2016, Connexx has employed a variety of hourly employees at the Call Center, including in-bound and out-bound customer service representatives or "call center agents" who spend their work time on the phone providing customer service and scheduling for customers, "leads" who supervise call center agents, quality assurance or "QA" agents who monitor agents' calls, dispatch employees who coordinate transportation services, information technology staff, and order management staff.[1] Different types of employees use different computer programs to do their jobs.[2] Hourly employees usually clock in and out using a computer program; they used ADP from November 2016 to June 2017 and PayCom from June 2017 to present.[3] Kamaka Decl. ¶6. Connexx requires hourly employees to record all hours worked and prohibits working "off the clock." *Id.* ¶4. These policies are communicated to employees verbally and in writing. *Id.* ¶5. As detailed herein, practically every Call Center employee in this case has testified they were aware of these policies, instructed by their supervisors to comply with them, did comply with them, and could use various measures to correct their time entries if needed.

### B.  Procedural History

This case was filed on January 3, 2018. ECF No. 1-1. The original Named Plaintiff, Danielle Curley ("Curley"), alleged she had not been paid adequately for time spent booting up

---

[1] *See* Exhibit A, "Kamaka Dep." (10/16/19) at 14-15, 30, 39-41; Exhibit B, "Curley Dep." at 36-40; Exhibit C, "Cummings Dep." at 21-22; Exhibit D, "Alford Dep." at 13, 16; Exhibit E, "Schavers Dep." at 20, 66, 92.
[2] Kamaka Dep. at 35-36, 38, 41-42; Exhibit F, "Saxton Dep." at 32; Curley Dep. at 57.
[3] One Plaintiff testified he could clock in using an app on his cell phone. Schavers Dep. at 49.

and booting down her computer and related activities at the Call Center. *Id.* ¶¶15-16. She alleged that Defendants violated the Fair Labor Standards Act ("FLSA"), Nevada statutes, the Nevada Constitution, and Nevada law on breach of contract. *Id.* ¶¶25-60. Curley sought to bring this suit on behalf of herself and other hourly employees, as an opt-in collective action under the Fair Labor Standards Act ("FLSA") and as an opt-out class action under Rule 23. *Id.* ¶¶22-23.

On February 5, 2019, Curley moved for conditional certification of her FLSA claims. ECF No. 19. On May 13, 2019, the Court applied the "lenient" conditional certification standard, granted the motion, and authorized notice to be sent to current and former hourly employees who worked at the Call Center. ECF No. 28 at 5, 10. The Court relied on Curley's declarations and declined to give weight to Defendants' declarations because Curley had not yet conducted discovery. *Id.* at 6-7. Notices and consent forms were sent to 195 potential collective members on June 5, 2019. ECF Nos. 30; 37-1 ¶¶6-9. Very few joined the case.[4] Plaintiffs' counsel filed 18 consent forms on September 12, 2019, and two more consent forms in January 2020. ECF Nos. 33-1, 43, 47. Curley stopped communicating with her counsel, and, the Court granted leave for Plaintiffs to substitute Cariene Cadena and Andrew Gonzales (hereinafter "Named Plaintiffs") in an Amended Complaint. ECF No. 45. During discovery, three Opt-in Plaintiffs failed to respond to a Court Order and were dismissed with prejudice. ECF Nos. 70, 71. Another withdrew her consent form. ECF No. 62. Discovery closed on September 25, 2020. ECF No. 69. Herein, Defendants refer to the fifteen remaining employees who filed consent forms as the "Opt-in Plaintiffs,"[5] and refer to the Named Plaintiffs and Opt-in Plaintiffs collectively as "Plaintiffs."

---

[4] A low response rate may indicate there was no uniform practice violating the FLSA. *Smith v. T-Mobile USA, Inc.,* 2007 U.S. Dist. LEXIS 60729, at *18-20 (C.D. Cal. Aug. 15, 2007).
[5] This includes: Donna Alford, Brandon Cadena, Judith Cummings, Danielle Curley, Clarissa Dix, Diana Giraldo, Kevin Kinyon, Kenya Mills, Richard Ortiz, Krystal Paynther, Dawn Pratt, Rossalind Saxton, Nathan Schavers, Marguerite Simon, and Steven Somodi.

### III.   LEGAL STANDARD

There is a two-step certification process in FLSA collective actions. At preliminary certification, also known as "conditional" certification, the court is "focused on a review of the pleadings" and applies a "lenient" standard. *Campbell v. City of L.A.,* 903 F.3d 1090, 1109 (9th Cir. 2018). Preliminary certification "does not produce a class with an independent legal status or join additional parties to the action." *Delara v. Diamond Resorts Int'l*, 2020 U.S. Dist. LEXIS 75803, at *4 (D. Nev. Apr. 30, 2020) (quoting *Campbell*, 903 F.3d at 1101). "The sole consequence of a successful motion for preliminary certification is the sending of court-approved written notice to workers who may wish to join the litigation." *Id.* After the close of discovery, "defendant may instigate the second step of the certification process by moving for 'decertification.'" *Id.* at * 5 (quoting *Campbell*, 903 F.3d at 1109). "If the motion for decertification is granted, the result is a negative adjudication of the party plaintiffs' right to proceed in a collective," "opt-in plaintiffs are dismissed without prejudice, … and the original plaintiff is left to proceed alone." *Id.*

At decertification, the court will "take a more exacting look at the plaintiffs' allegations and the record." *Id.* at 1109. The central inquiry is whether the named plaintiffs and opt-in plaintiffs are "similarly situated." *Delara*, 2020 U.S. Dist. LEXIS 75803. To meet this standard, "party plaintiffs must be alike with regard to some *material* aspect of their litigation." *Campbell*, 903 F.3d at 1114 (emphasis original).  They must be "alike in ways that matter to the disposition of their FLSA claims." *Id.* Similarities and dissimilarities in other respects are irrelevant. *Id.* "[W]hat matters is not just *any* similarity between party plaintiffs, but a legal or factual similarity material to the resolution of the party plaintiffs' claims, in the sense of having the potential to advance these claims, collectively, to some resolution." *Id.* at 1115 (emphasis original). And even if the plaintiffs are similarly situated, decertification is proper if, "as a practical matter," it would be infeasible to

conduct a trial of the plaintiffs' claims on a collective basis. *Id.* at 1115-16. "Because of its purpose and timing, decertification can resemble a motion for partial summary judgment on the 'similarly situated' question, and may be combined with cross-motions for summary judgment." *Id.* at 1109. "At this point, the district court has a much thicker record than it had at the [preliminary certification] stage, so, as with a post-discovery dispositive motion, the plaintiff bears a heavier burden." *Id.* at 1117-18 (quote omitted). Plaintiffs must provide "substantial evidence" that they are similarly situated; otherwise, their claims must be decertified. *Id.*

## IV.   ARGUMENT

Plaintiffs' collective action should be decertified because they cannot satisfy the heavier burden of proving they are similarly situated with substantial evidence. Plaintiffs are not similarly situated with respect to the *material* issues that are dispositive of their FLSA claims. Here, the main dispositive issues are (1) whether the pre- and post-shift activities at issue are "work" which depends on whether Defendants had knowledge and required them to perform the activities off the clock;[6] and (2) whether time spent on the activities was "*de minimis*", which depends on (a) "the amount of daily time" spent on the activities, (b) the regularity or irregularity of the time spent on the activities, and (c) the practical and administrative difficulty of recording the time.[7]  Here,

---

[6] *See Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir. 1981) ("where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207."); *White v. Baptist Mem'l Health Care Corp.,* 699 F.3d 869, 876 (6th Cir. 2012) ("if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process."); *Waine-Golston v. Time Warner Entm't-Advance,* 2013 U.S. Dist. LEXIS 43899, at *11 (S.D. Cal. Mar. 27, 2013) (granting summary judgment on FLSA claim because there was no evidence that Plaintiffs were required to load computer programs prior to clocking in).

[7] *Lindow v. U.S.*, 738 F.2d 1057, 1062-63 (9th Cir. 1984); *see also Waine-Golston,* 2013 U.S. Dist. LEXIS 43899, at *18 (concluding that time spent booting up and logging in was *de minimis*).

DEFENDANT'S MOTION FOR DECERTIFICATION AND SUPPORTING MEMORANDUM – 5

Plaintiffs are not similarly situated on these issues. Their testimony has been inconsistent and contrary to the allegations in the Amended Complaint. Connexx prohibited off-the-clock work, and any deviations from that policy by Plaintiffs involve individualized evidence. Their claims are not susceptible to collective proof.

**A. Plaintiffs Are Not Similarly Situated With Respect to their Off-the-Clock Claims Because Connexx Prohibited Off-the-Clock Work.**

Connexx requires non-exempt employees to record all hours worked and prohibits employees from working "off the clock." This is both the official policy[8] and the actual practice at the Call Center. Numerous hourly employees at the Call Center have testified that they were aware of this policy and instructed by their supervisors to follow this policy.[9]

Likewise, Plaintiffs themselves testified they were required to record all of their work time and were instructed by their supervisors to do so. For example, Donna Alford and roughly 45 other employees attended a new employee orientation and were told they needed to be clocked in whenever working. Alford Dep. at 22-24. Alford understood the timekeeping policies in the handbook; each employee was responsible for recording their time; and her lead would remind her that she must be clocked in whenever working. *Id.* at 25, 27-30; *see also* Cummings Dep. at 35-36

---

[8] Connexx's policies state employees "should not start work unless they have properly clocked in" and "an employee is not allowed to work for the company off the clock." Exhibit P, Excerpts of 2016 Handbook; Exhibit Q, Excerpts of 2017 Employee Handbook; Kamaka Dec. ¶4.

[9] *See* ECF No. 25-1, "Dalupan Dec." ¶9 ("I am aware that Customer Connexx company policy requires hourly employees including myself, to record all hours worked honestly and accurately."); ECF No. 25-4, "I. Gomez Dec." ¶9 ("When I started working with Customer Connexx…my manager…instructed me that I must clock in before I start working…and that I was not to perform any work after I clocked out."); ECF No. 25-2, "Gatlin Dec." ¶9; ECF No. 25-3, "Godoy Dec." ¶9; ECF No. 25-5, "J. Gomez Dec." ¶6; ECF No. 25-6, "Guizar Dec." ¶6; ECF No. 25-7, "Guzman Dec." ¶9; ECF No. 25-8, "Howze Dec." ¶8; ECF No. 25-9, "McCarron Dec." ¶9; ECF No. 25-10,"Monge Dec." ¶10; ECF No. 25-11, "Poole Dec." ¶8; ECF No. 25-12, "Pryor Dec." ¶8; ECF No. 25-13, "Reneau Dec." ¶9; ECF No. 25-14, "Roman Dec." ¶8; ECF No. 25-15, "Smith Dec." ¶8; ECF No. 25-16, "Tuilaepa Dec." ¶8; ECF No. 25-17, "Wilcox Dec. ¶8; ECF No. 25-18,"Wilkerson Dec." ¶8; ECF No. 25-19, "Williams Dec." ¶8.

(understood employees were not allowed to work off the clock; supervisors told her she needed to be on the clock while working); Schavers Dep. at 34-36 (managers instructed employees they "should be clocked in at the time that we should start working;" it was a violation of policy to start work prior to clocking in); Curley Dep. at 95 (understood she was responsible for accurately reporting all hours worked); Exhibit G, "Dix Dep." at 59 (Connex required employees to record all work hours accurately); Exhibit H "Giraldo Dep." at 53, 65-66 (knew she was responsible for keeping accurate time records and not allowed to work off the clock; supervisors told her this); Saxton Dep. at 38-39, 48 (it was common knowledge at the Call Center that employees needed to clock in first thing when they arrived; she never observed her subordinates working off the clock).

To the extent any Plaintiffs were required to work off the clock, it was in violation of company policy and their claims depend on individual evidence that is contrary to the testimony of the vast majority of employees. For example, Kenya Mills testified she knew Connex's policy required her to be clocked in before she started working and off-the-clock work was prohibited, but she violated policy anyway. Exhibit I, "Mills Dep." at 27-28. She violated the policy even though the Call Center Director and another supervisor told her to record all her time and be clocked in whenever working. *Id.* at 30-31. In fact, "that was something they, you know, reiterated all the time. Every day to everybody." *Id.* Unlike other Plaintiffs and employees, Mills initially testified that a couple leads, including co-Plaintiff Danielle Curley, told her to start working before she clocked in. *Id.* at 31-34. She later backtracked and testified that no one encouraged her to work off the clock or told her to do so, but that she subjectively felt it was expected because "we were there to start a call center from the ground up" and "serve our clients by all means necessary." *Id.* So, to the extent Mills violated the policy, she did so for personal reasons, and her inconsistencies create individual credibility issues. She is not similarly situated to any other Plaintiffs.

DEFENDANT'S MOTION FOR DECERTIFICATION AND SUPPORTING MEMORANDUM – 7

In a similar collective action alleging unpaid pre- and post-shift work despite a widely disseminated policy prohibiting off-the-clock work, the Ninth Circuit affirmed decertification. *Campbell,* 903 F.3d at 1102, 1121. In *Campbell*, the police officer plaintiffs were "subject to a written, FLSA-compliant policy prohibiting off-the-clock work," and were "required to report all overtime accurately." *Id.* at 1102. The policy was "widely known among the Officers." *Id.* The officers, however, contended that "the Department follows an unwritten policy that dissuades, and as a practical matter prevents, accurate time reporting." *Id.* Reviewing de novo, the Ninth Circuit held that the officers' failure to prove a "Department-wide policy" was critical. *Id.* at 1120. Although some officers' testimony was "creditable evidence of instances of unpaid overtime," the officers' testimony was insufficient to establish "a uniform practice" and at most showed "variable practices variably applied." *Id.* at 1120-21. There was no evidence of "a uniform policy against reporting small amounts of overtime," and "no evidence to suggest that the declarants' vaguely reported experiences are in fact representative of the experiences of the party plaintiffs Department-wide." *Id.* at 1120. Considering the widely disseminated policy, the defendant's evidence of FLSA compliance, and the officers' lack of proof of a "tacit policy of noncompliance" throughout the Department, the Ninth Circuit affirmed decertification. *Id.* at 1121.

The present case is directly analogous to *Campbell*. There is abundant evidence of a FLSA-compliant timekeeping policy that was widely disseminated at the Call Center. At most, Plaintiffs may produce some testimony that individuals chose to violate the timekeeping policy or that variable practices were variably applied. They cannot prove "a tacit policy of noncompliance" throughout the whole Call Center, especially because so many employees, including most of the Plaintiffs, have testified that the actual policy and practices at the Call Center prohibited off-the-clock work. *See also Seward v. IBM,* 2012 U.S. Dist. LEXIS 49688, at *80 (S.D.N.Y. Jan. 20,

2012) (decertifying collective action of call center agents alleging claims for unpaid boot up time because plaintiffs failed to show uniform and pervasive policy requiring off-the-clock work).

**B. Plaintiffs Are Not Similarly Situated with Respect to their Claims of Off-the-Clock Time Spent on Pre-Shift Activities.**

Plaintiffs allege they were "required" to boot up their computer, load programs, and confirm their phone was connected *prior to clocking in*, and it took *10-20 minutes* to do these activities. Am. Compl. ¶17. At their depositions, the Named Plaintiffs gave testimony about these activities that was plainly inconsistent with their earlier declarations and the Amended Complaint. Therefore, the Named Plaintiffs may be impeached with inconsistent testimony, unlike most Opt-in Plaintiffs. Generally, the Opt-in Plaintiffs have provided testimony that contradicts the Named Plaintiffs' declarations and the allegations in the Amended Complaint. However, there is diverse testimony within the group, outliers, and factual differences that relate directly to the dispositive issues of their FLSA claims. These factual differences and individual credibility issues, as detailed below, show that Plaintiffs are not similarly situated with respect to the pre-shift activities.

*1. The Named Plaintiffs*

In her declaration, Cadena testified she spent about 10-15 minutes per day booting up her computer and opening programs prior to clocking in. ECF No. 32 at 52-54, Cadena Decl. ¶¶6-7. At her deposition, however, she testified it only took about 1-2 minutes to do these tasks. Exhibit J, "Cadena Dep" at 91, 150, 191. During a time period when she opened the facility and also turned on the lights (a unique duty), it only took her 3-4 minutes total (using a laptop) or 5-8 minutes (using a desktop).[10] *Id.* at 95-96, 100. In her declaration, Cadena testified she would open computer

---

[10] Cadena was not required to turn on the lights, and none of her supervisors knew she was doing so. *Id.* at 93-94, 99-100. In contrast, no Opt-in Plaintiffs testified about turning on lights. And unlike Cadena, the Opt-in Plaintiffs used only desktop computers. Kamaka Dep. at 30.

programs before clocking in. Cadena Decl. ¶6. At her deposition, however, she testified (1) she was instructed to open the timekeeping program and clock in "first thing" prior to doing any work, and (2) she, in fact, opened up that program to clock in before she opened up the other computer programs. Cadena Dep. at 77-78, 94, 103-04, 187-90.[11]

Gonzales testified inconsistently, too. In his declaration, he testified that, before his promotion, he spent about 10-20 minutes booting up and opening programs before clocking in, and it took 5-6 minutes to do the same tasks after his promotion. ECF No. 32 at 56-59, Gonzales Decl. ¶¶6-7. At his deposition, however, he testified it took less than a minute to boot up and clock in. Exhibit K, "Gonzales Dep." at 98-99, 156. The 10-20 minute figure concerned only a subset of days when he had problems and was a "guesstimation." *Id.* at 99, 170. In his declaration, he testified he would open programs before clocking in. Gonzales Decl. ¶6. At his deposition, however, he testified he was expected to clock in first, which is what he did. Gonzales Dep. at 86.

### 2. Opt-In Plaintiffs and Other Employees

Unlike the Named Plaintiffs, most Opt-in Plaintiffs have not submitted dueling, inconsistent testimony via declaration and deposition. And contrary to the Named Plaintiffs' declarations, many Opt-in Plaintiffs and other employees testified it only took seconds or a few minutes to boot up and clock in, though the experiences and times varied from person to person. *See, e.g.,* Exhibit L, "Sigmon Dep." at 48, 51, 53 (about 1-2 minutes total to boot up computer, log

---

[11] In her declaration, Cadena testified she knew that "all other call center employees" had to clock in and out the same way she did and that none of these employees were paid for time booting up and down. Cadena Decl. ¶11. At her deposition, however, Cadena testified (1) she had "no knowledge" of how other employees clocked in at the start of the day, except for those she could observe in her area (dispatch, IT, and QA employees), (2) she could not observe call center representatives because they worked in a different area, (3) at the end of the day, she could not observe many people at all because she was one of the first employees to leave, and (4) she was not aware of any employees who performed work before clocking in or after clocking out. Cadena Dep. at 141-43. She even admitted that Paragraph 11 of her declaration was an uncandid exaggeration. *See id.* at 167 ("I may have stretched it with the 'all' word.")).

in, and clock in); Exhibit M. "Brandon Cadena Dep." at 36-38, 43 ("30 seconds to a minute" to

boot up computer if it was off and even less time if it was in sleep mode; 30-60 seconds to open

up programs; "a couple of seconds" to plug in headset); Alford Dep. at 40-42 (computers that were

already on or in sleep mode booted up instantly; other computers took 1-2 minutes, though it

varied; and only took 30 seconds to clock in on the timekeeping program); Exhibit N, "Ortiz Dep."

at 44-45 (restarted his computer every shift, even though not required, which took about 1-1.5

minutes, and took "a minute or two" to log in and clock in); Dix Dep. at 44-45 (could not estimate

how long it took to boot up and took only a few seconds to log in).[12]

How quickly it took to boot up and clock in and the regularity or irregularity of those times

depended on many factors that varied based on each Plaintiff's circumstances, such as their job

position, their shift, whether they used the same computer every day, whether the computer(s) used

were already on, off, or in sleep mode on arrival, the time period they worked, and whether it was

after computers were replaced with faster ones. *See* Alford Dep. at 41-42 (computers were in sleep

---

[12] *See also* Dalupan Dec. ¶16 ("[M]y computer is powered on and waiting at the login screen when I arrive at work. Once the log in screen comes up, the very first thing I do is clock in using the computerized time clock. I estimate it takes approximately 30 seconds for me to clock in after I log on to the computer."); Gatlin Dec. ¶16 ("If the computer is already turned on, it takes approximately 1 to 2 seconds for the log-in screen to come up. Once the log-in screen comes up, the very first thing I do is clock in using the computerized time clock. I estimate it takes less than 60 seconds for me to clock in after I log onto the computer depending on how quickly I type my login credential to PayCom."); Godoy Dec. ¶16 ("If the computer is turned off, it takes about 10-15 seconds for the computer to start and the log-in screen to come up. If the computer is already turned on, it takes 1 to 2 seconds for the log-in screen to come up…I estimate it takes less than one minute for me to clock in after I log on to the computer."); I. Gomez Dec. ¶13 ("20 seconds" to clock in with PayCom, and "15 seconds to log in using ADP"); J. Gomez Dec. ¶15 ("clocking into PayCom only takes me about 20 seconds."); Guzman Dec. ¶16 ("I estimate it takes less than 5 seconds for me to clock in after I log on to the computer."); Howze Dec. ¶17 ("If the computer was turned off, it takes about 30 seconds for the computer to start and the log-in screen to come up…I estimate it takes less than 5 or 6 seconds for me to clock into Paycom after I log on to the computer."); McCarron Dec. ¶16 ("If the computer is turned off, it takes about 30 seconds for the computer to start and the log-in screen to come up…[and] less than 5 seconds for me to clock in after I log on to the computer."); Poole Dec. ¶15; Pryor Dec. ¶15; Reneau Dec. ¶ 16; Roman Dec. ¶15; Smith Dec. ¶14; Wilcox Dec. ¶15; Wilkerson Dec. ¶16; Williams Dec. ¶14.

mode about 1/3 of the time and booted up instantly but were "off" about 2/3 of the time and took about 1-2 minutes to boot up); Cummings Dep. at 57, 59 (computers were usually on when she arrived, but morning shift got the best computers and spent less time logging in); Mills Dep. at 46, 49-50 (her usual computer was on 20% of the time, and was off or in sleep mode about 80% of the time; sometimes, a lead came in early and turned on a lot of computers); Schavers Dep. at 52-56, 59-60 (computers were usually off when he arrived, but only took about 3 minutes to boot up; early shift employees, leads, and QA agents got faster computers; and, at some point, half the computers were replaced with newer computers with faster systems, which decreased boot up time; he only had significant computer delays about 2-3 times per month); Saxton Dep. at 27, 61-62 65-66 (had her own assigned computer, but other agents did not; took 2-5 minutes to boot up and "a couple of minutes to get logged in and clocked in"); Brandon Cadena Dep. at 35 (used same computer "basically every day" and it was "quicker" than others); Curley Dep. at 41, 44 (did not have assigned computer, and time needed to log in varied from day to day); Dix Dep. at 40-43, 49-50 (boot up times depended on (a) if computer was shut down the prior shift, which was a personal preference; (b) if you got a new, upgraded computer; (c) which shift you because computers were already on for second shift employees and took less time to boot up); Ortiz Dep. at 28 (while on early shift, had "first dibs" on faster computers and used same computer 95% of time; at some point, policy changed from unassigned to assigned computers); Giraldo Dep. at 31, 33-36 (used same computer every day and was usually off when she arrived; took a couple minutes to start up and clock in; although she opened the timekeeping program first, she would then simultaneously open other programs while clocking in, and amount of time spent varied every day).

Many employees testified they were not required to load programs and set up phones while off the clock, and, to the contrary, were instructed to clock in before doing those tasks.[13]  Likewise, almost all Opt-in Plaintiffs testified they were not required to load programs and set up their phones while off the clock. Alford Dep. at 30, 36-37, 42-43 (never told by supervisor to open other programs before clocking in; did not open other programs or set up phone prior to clocking in); Saxton Dep. at 51, 66 (clocked in before opening other programs and did not have to plug in headset before clocking in); Curley Dep. at 108-10 (would clock in first and then load other programs; in fact, the programs made it impossible to set up the phone until after clocking); Dix Dep. at 45, 47-48 ("first thing" she did was open Paycom and clock in); Sigmon Dep. at 50 (would first clock in and then open up other programs); Ortiz Dep. at 43-44 ("would clock in and then I would open up all my programs", which is what employees were supposed to do); *cf.* Giraldo Dep. at 33-36, 50-51 (understood she was supposed to clock in before opening other programs, even though that is not what she actually did).

Yet, some Opt-in Plaintiffs testified quite differently about the pre-shift activities.  For example, Kenya Mills testified the pre-shift activities took longer than the times stated by other employees and Plaintiffs. She testified it took 10 minutes overall to get clocked in; took about 3

---

[13] *See* Dalupan Dec. ¶12 ("I was also instructed … I must clock in before I start working, including before I log into any work software programs or log in to begin taking calls for the day"); Godoy Dec. ¶¶12, 16 ("As a team lead, I instruct employees that they must clock in before they start working, including before they log into any work software programs or log in to begin taking calls for the day."); Gatlin Dec. ¶¶12, 16 ("After I am clocked in, I begin loading work software programs and log into the phone to begin working. I do not conduct any work before I am clocked in."); Monge Dec. ¶19 ("I and all the other team leads instruct the representatives that once the log in screen comes up, the very first thing they must do is clock in using the computerized time clock."); Smith Dec. ¶¶10, 14 ("After I clock into PayCom, I begin opening other computer pro-grams I need to work for the day."); I. Gomez Dec. ¶¶9, 14; J. Gomez Dec. ¶¶9, 15; Guizar Dec. ¶¶9; Guzman Dec. ¶¶12, 16; Howze Dec. ¶17; McCarron Dec. ¶12, 16; Poole Dec. ¶11, 15; Reneau Dec. ¶12, 16; Roman Dec. ¶¶11, 15; Smith Dec. ¶10, 14; Tuilaepa Dec. ¶11, 15; Wilcox Dec. ¶¶11, 15; Wilkerson Dec. ¶¶11, 15; Williams Dec. ¶¶11, 14.

minutes to boot up computers, but they would start up quickly sometimes and slowly other times; it varied and was a "roll of the dice"; and took 3 minutes to clock in with ADP. Mills Dep. at 45, 50-53, 55-56. However, her routine in the morning was unique, and delays were caused by her perplexing decision making. She would start at the same computer every day even though she knew the computer did not work and was not assigned to it; then, after her computer of choice inevitably did not boot up, she would restart the whole process at another computer. *Id.* at 46-48, 56-57. Asked why she continued to start each day at the dysfunctional computer, Mills stated "that's where I was most comfortable sitting" and "you have to ask my chakra about that one because it just felt right." *Id.* at 57-48. She also testified the first program she opened was ADP; however, unlike most other Plaintiffs and employees, she would open other programs at the same time before clocking in.[14] *Id.* at 45, 59. Unlike other Plaintiffs, Mills claims she should also be paid for time spent picking up her headset at a cubbyhole and plugging it in. *Id.* at 74-76. However, no supervisor ever told her she was required to do this before clocking in. *Id.* at 78. Unlike other Plaintiffs, Mills also testified she was required to have work meetings with her leads that lasted 15-20 minutes in the morning; this would happen "every day" and was "sometimes" off the clock, but she could not estimate how often. *Id.* at 83-87. Mills's testimony is sharply distinct from the other Plaintiffs and she is not similarly situated to any of them.

Another factually divergent Plaintiff, Donna Alford, arrived later than most employees when most computers were already taken. Alford Dep. at 32, 37, 60. As a result, she claims she could find a computer that was on or in sleep mode (that would boot up instantly or in 1-2 minutes) only 1-2 days a week and the other days she got someone from IT to help her find a computer (which took 4-5 minutes). *Id.* at 35, 37-39. She also stated in her interrogatory responses it took

---

[14] *Compare* Schavers Dep. at 60-61 (would open programs one at a time).

30-45 minutes to find a computer. *Id.* at 71, 73. She presents unique facts with respect to the lengthy amount of time allegedly spent on pre-shift activities and the regularity of those activities.

Unlike other Plaintiffs, Brandon Cadena claimed his supervisors told him he needed to study scripts before clocking in, but later testified he could not recall if that were accurate; he studied the scripts before clocking in but not every day and only until he learned the scripts and he was not sure how long that time period lasted; depending on when he arrived, he sometimes opened up programs before clocking in, though he did not know whether or not his supervisors knew he was doing that. Brandon Cadena Dep. at 26, 28, 34, 38-39, 73-74.

Unlike others, Judith Cummings testified she spent 15-30 minutes on pre-shift activities. However, many of the activities were unique to her and she could not remember if they took place before or after she clocked in. *See* Cummings Dep. at 34, 37-38, 46-48, 56, 58-59, 62-63, 65-67 (took 15-20 minutes and sometimes as long as 30 minutes to find a computer, find a chair (she was 5'2" and most chairs did not fit her), wipe down everything in her cubicle (not a required task), clock in, open programs, and plug in her headset; could not remember if she clocked in first and then opened other programs or vice versa; could not remember what order she was instructed to perform those tasks; could not remember if she plugged in her headset before or after clocking in/out; how long it took to boot up and log in would vary and "depend on the luck of the draw … as they say in Las Vegas it was a crapshoot;" claims clock-in process alone took at least 5 minutes; could not remember how long it took to open up other programs); *see also* Dix Dep. at 42 (would sometimes go to the break room or bathroom between booting up and clocking in); Saxton Dep. at 44-45, 64, 75-76 (as a supervisor, she helped subordinates with issues if they stopped her before she clocked in; amount of time this took varied from 2-5 minutes).

In sum, the Named Plaintiffs have submitted inconsistent testimony about the pre-shift activities. Most Opt-in Plaintiffs and other employees have testified that time spent on the pre-shift activities was miniscule or on-the-clock, which contradicts the Named Plaintiffs' declarations. Further, there are significant factual variations, deviations, and outliers among the Opt-in Plaintiffs. Considering this evidence, Plaintiffs cannot prove they are similarly situated as to the pre-shift activities. *See Seward,* 2012 U.S. Dist. LEXIS 49688, at *80 (decertifying collective action of call center representatives because there were many factual differences among the plaintiffs).

## C. Plaintiffs Are Not Similarly Situated with Respect to their Claims of Off-the-Clock Overtime Spent on Post-Shift Activities.

In the Amended Complaint, Plaintiffs allege they were "required" to close programs, turn off their computers, and wait for them to power down *after clocking out*, and it took *6-8 minutes* to perform these activities. Am. Compl. ¶18. The Named Plaintiffs provided inconsistent testimony with respect to these activities and are therefore subject to individualized credibility determinations. Generally, the Opt-in Plaintiffs and other employees provided testimony that contradicts the Named Plaintiffs' declarations and the Amended Complaint. However, there are significant factual distinctions and unique allegations among the Opt-in Plaintiffs. Plaintiffs' inconsistent testimony, their factual differences, and the individual credibility issues needed to resolve their claims demonstrate that they are not similarly situated with respect to the post-shift activities.

### 1. *Named Plaintiffs*

In her declaration, Cadena testified she spent about six minutes closing programs and shutting down her computer after clocking out. ECF No. 32 at 52-54, Cadena Decl. ¶¶8-9. At her deposition, however, Cadena testified it only took 1-2 minutes to shut down (using a laptop) or 2-4 minutes (using a desktop). Cadena Dep. at 123-24, 150-51. Further, Cadena testified (1) she was

never told to clock out before closing other programs, and (2) she closed out all programs *before* clocking out.  *Id.* at 113, 123-24, 193.

In his declaration, Gonzales testified he spent 5-8 minutes closing programs and shutting down his computer after clocking out. ECF No. 32 at 56-59, Gonzales Decl. ¶¶8-9. He also testified he was told to wait for the computer to shut down before leaving. Gonzales Decl. ¶8. At his deposition, however, he testified that no one ever told him to wait for his computer to shut down. Gonzales Dep. at 109, 157.  Also contradicting his declaration, he testified that he closed out the programs *before* clocking out. *Id.* at 107-08. He testified that clocking out was supposed to be the last thing he did on the computer. *Id.* at 108. Further, he testified it only took 30-40 seconds to shut down, in contrast to the 5-8 minutes stated in his declaration. *Id.* at 110. He testified that it would take longer than 30-40 seconds rarely or, as he put it, "once in a blue moon." *Id.*  Also contradicting his declaration, at his deposition stated (1) he did not know the routines or sequences of how other employees booted up and down, (2) other employees did not wait for the computer to fully shut down before leaving and, in fact, he "was the only one that actually sat there and watched it all shut down and register before [he] left." *Compare id.* at 122-23, 161-62, *with* Gonzales Decl. ¶11.

### 2.   *Opt-in Plaintiffs and Other Employees*

Unlike the Named Plaintiffs, most Opt-in Plaintiffs have not submitted inconsistent testimony via declaration and deposition.  And contrary to the Named Plaintiffs' declarations, most Opt-in Plaintiffs and other employees testified they were not required to perform any of the alleged post-shift activities while off the clock and the amount of time needed to perform these activities was miniscule.  However, as with the pre-shift activities, some Opt-in Plaintiffs had unusual post-shift routines and provided distinct testimony on key factual issues.

Most Opt-in Plaintiffs and other employees testified they shut down programs and turned off their phone while on the clock, were not required to wait for the computer to shut down or perform other work activities while off the clock, and that it took virtually no time to do these activities. *See, e.g.,* Alford Dep. at 44-46, 69 (turned off phone and closed programs before clocking out; only took a few seconds to log off; was not required to do any work after clocking out; and did not wait for computer to shut down); Cummings Dep. at 71, 73-74 (clocking out was typically the last thing she did before leaving; never did work after clocking out; would only take "a second or two" to turn off the computer); Schavers Dep. at 76-78 (never did work after clocking out; closed programs before clocking out; took only a "few seconds" to turn off computer); Brandon Cadena Dep. at 46-47, 67 (closed all programs before he clocked out; took "a few seconds" to turn off computer; no one ever told him to turn off the computer; some employees did not turn off the computers and it was a "person-to-person" thing; does not contend that he is owed any wages for post-shift time); Curley Dep. at 57-59, 110 (would close out programs, then clock out, then shut down computer and leave; it usually only took a few seconds to a minute to shut down); Dix Dep. at 52-53 (would close out all programs before clocking out and did not work after clocking out); Sigmon Dep. at 56-57 (would close out programs prior to clocking out; then, would push power button and leave, which took a few seconds; would not wait for computer to shut down); Ortiz Dep. at 43, 46 (took only 10-15 seconds to clock out and log out; employees were not required to shut down their computers and most did not).[15]

---

[15] *See also* Poole Dec. ¶16 ("I leave my desk the second I clock out of Paycom."); Gatlin Dec. ¶17 ("[T]he last thing I do is clock out. I logoff the computer and … I do not remain while the computer logs off. No one at Customer Connexx has ever told me I need to wait to ensure the computer properly logs off."); Smith Dec. ¶15 ("I turn the power off on my computer every day…which usually takes less than one minute. This is my habit no one at [Connexx] has ever told me I need to wait to ensure the computer properly shuts down."); Godoy Dec. ¶17 ("[T]he last thing I do is clock out…I do not perform any work after I clock out for the day. No one at [Connexx] has ever

Yet, some Opt-in Plaintiffs testified to dissimilar experiences, routines, and amounts of time due to individual circumstances. *See* Cummings Dep. at 29 (not all employees closed programs and shut down their computers at the end of day); Dix at 130 (some supervisors would ask employees to shut down computers; other supervisors told employees to leave it on); Dix Dep. at 133-34, 136-37 (would take 10-15 minutes for computer to shut down but this changed when she was assigned to a different team with upgraded computers that only took 1-3 minutes to shut down); Saxton Dep. at 51, 67-68 (closed out of programs before clocking  out; waited for her computer to shut down, about a minute, only because she was a supervisor and there was confidential information on it); Curley Dep. at 74 (not all employees shut down their computers at end of day); Giraldo Dep. at 38-45, 51 (was expected to close programs and then clock out; she would clock out and then close programs at the same time, which did not cause delays; waited for computer to shut down which took about two minutes on average; dropped off stuff in cubby while it shut down; came back and to wipe computer down; whole process took 5-10 minutes).

As another example of irregular post-shift routines, Kenya Mills testified she would close the programs after clocking out sometimes and before clocking out other times. Mills Dep. at 66-67. She could not estimate how often she closed the other programs while off the clock. *Id.* at 67-68. She stated it ranged from two to "maybe" 10 or 15 minutes, but she had difficulties estimating because it varied so much. *Id.* at 68. She testified it took either 30 seconds or 2-3 minutes to shut down the computer after clocking out. *Id.* at 70-71. She testified that her supervisors never told her to close the programs while off the clock, but she thought they were aware of this because of her general complaint that her computer had problems. *Id.* at 72. Unlike most Plaintiffs, Mills

told me I need to wait to ensure the computer properly shuts down, and I am not aware of anyone being told this."); I. Gomez Dec. ¶15; J. Gomez Dec. ¶16; Guizar Dec. ¶16; Guzman Dec. ¶17; Howze Dec. ¶18; McCarron Dec. ¶17; Monge Dec. ¶¶20, 22; Dalupan Dec. ¶17; Pryor Dec. ¶16; Reneau Dec. ¶17; Roman Dec. ¶16; Tuilaepa Dec. ¶16; Wilcox Dec. ¶16; Williams Dec. ¶15.).

unplugged and put away her headset in a cubbyhole; this "sometimes" happened after clocking out, but she could not estimate how often. *Id.* at 79-80. She did not have a routine or "regular order" of tasks at the end of her day. *Id.* at 80. Unlike other Plaintiffs, she also testified that she was required to have meetings with her leads that would last 10-15 minutes at the end of the day; this would happen "every day" and was "sometimes" off the clock, but she could not estimate how often.[16] *Id.* at 80-87. Mills's testimony is unique, and she is not similarly situated to other Plaintiffs.

Other Plaintiffs also had a unique claims about post-shift time. *See* Cummings Dep. at 38-40, 94, 96 (claims she was not paid for time spent on phone calls that ran late at the end of the day); Curley Dep. at 59, 73, 98-99 (claims she had to spend time making sure that everyone else's computers were shut off after she clocked out and turned off the lights as a manager, although she was paid for some of this time); Saxton Dep. at 39, 72, 74 (claims she helped subordinates who stopped her after she clocked out; amount of time it took varied from 2-7 minutes).

In sum, the Named Plaintiffs have submitted inconsistent testimony about the post-shift activities. Most of Opt-in Plaintiffs and other employees have contradicted the Named Plaintiffs' declarations and testified that time spent on these activities was on-the-clock and miniscule, though there are significant factual distinctions among them. Considering this evidence, Plaintiffs cannot prove they are similarly situated with respect to the post-shift activities.

**D. Plaintiffs Are Not Similarly Situated Because of the Process to Correct Time Entries.**

Employees at the Call Center can review their recorded hours worked in the timekeeping system, receive emails reminding them to check their time for accuracy, and are instructed to notify their supervisors if there are any inaccurate time entries so that adjustments can be made.[17] Further,

---

[16] *But cf.* Cummings Dep. at 68 (did not recall off-the-clock meetings); Schavers Dep. at 79 (same).
[17] Kamaka Dec. ¶11; Alford Dep. at 54, 57; Exhibit R, Sample Email Reminders; Guizar Dec. ¶¶7-10, 23 ("In fact, we are reminded weekly to verify all our hours in the system so that we are

if employees had delays logging in or clocking in, they notify their supervisors, who will adjust

their time so that they are paid for that time.[18]  Indeed, many Plaintiffs confirmed they used various

procedures to correct their time entries if they were delayed logging in or had computer issues,

though their testimony varied. *See* Brandon Cadena Dep. at 48-49, 53 (could review recorded time

on Paycom; would email supervisor or use punch claim form to adjust time if needed; would check

behind the supervisor and confirm it had been corrected); Cummings Dep. at 61-62, 76, 93-94

(could review recorded hours on ADP and Paycom; would use punch claim forms or ask IT staff

member to make adjustments; the IT staff member "was great" and would fix her time; would

check and make sure her time had been corrected); Curley Dep. at 15, 42, 45, 54-55, 97-98, 124-

25, 144 (would email supervisors if her check were short; would submit punch claim form to adjust

---

properly compensated for all time worked."); Dalupan Dec. ¶¶10, 13; Gatlin Dec. ¶¶10-13; Godoy
Dec. ¶¶10-12; I. Gomez Dec. ¶¶7-10; J. Gomez Dec. ¶¶7-8; Guzman Dec. ¶¶10-13; Howze Dec.
¶¶9-13; McCarron Dec. ¶¶10-13; Monge Dec. ¶¶11-15; Poole Dec. ¶¶9-12; Pryor Dec. ¶¶9-12;
Reneau Dec. ¶¶10-13; Roman Dec. ¶¶9-12; Smith Dec. ¶¶9-11; Tuilaepa Dec. ¶¶9-12; Wilcox
Dec. ¶¶9-12; Wilkerson Dec. ¶¶9-12; Williams Dec. ¶¶ 9-10.

[18] Kamaka Dec. ¶10; Dalupan Dec. ¶13, 19 (supervisors explained she was supposed to submit a
form if she was delayed clocking in or out, and she would use this process if she had technical
issues or computer crashed); J. Gomez Dec. ¶¶ 7, 14 ("When the computers were slow or it took
me more than a minute to log on I let a lead know and they gave me a punch claim."); Howze Dec.
¶19 ("Seldom, there will be technical problems where the systems are down and IT is contacted. I
only recall one occasion of this happening, and when it happened, I told my supervisor or lead my
correct time, who filled out a Punch Claim form, and my time was corrected."); McCarron Dec.
¶19 ("I have had technical issues with the computer booting up less than five times…It may delay
me from clocking in. If that occurs, I submitted a Missed Punch Form to Ms. Smith."); Monge
Dec. ¶22 ("If there are technical problems or the system is down and an employee is prevented
from clocking into Paycom, I ensure they fill out a Punch Claim form."); Wilkerson Dec. ¶20 ("If
we have trouble with our computers or clocking in for whatever reason then we just have to tell
our supervisor and complete a Punch Claim form to ensure that we are properly paid. … We have
an opportunity to verify our time entries before payroll is run…"); Williams Dec. ¶16 ("When I
first started I locked myself out of PayCom because I tried my password too many times but when
that happened I told my manager and completed a Punch Claim Form."); Gatlin Dec. ¶13; Godoy
Dec. ¶13; I. Gomez Dec. ¶10; Guizar Dec. ¶¶10, 18; Guzman Dec. ¶13; Howze Dec. ¶¶10, 13;
McCarron Dec. ¶13; Monge Dec. ¶12; Poole Dec. ¶¶12, 17; Pryor Dec. ¶¶9, 12; Reneau Dec. ¶13;
Roman Dec. ¶12; Smith Dec. ¶¶9, 11, 16; Tuilaepa Dec. ¶¶12, 17; Wilcox Dec. ¶12, 17-18.

time if there were delays booting up or logging in; her time was always fixed and she got paid for that time); Dix Dep. at 53-54 (if delays booting up or clocking in, would submit a punch claim form and her time would be corrected); Gonzales Dep. at 66-73, 86-87, 95-97, 110-11, 170 (reported whenever he had problems booting up or booting down, such as when it took him longer than usual, and requested to have his time adjusted; in some instances, his time was adjusted correctly, and in other instances, he did not know whether his time was adjusted); Schavers Dep. at 28-29, 40, 50, 82, 86-87 (could review his recorded time via Paycom; would use email, Five9 messaging system, or punch claim forms to ask IT staff member or leads to correct his time if it took him a long time to log in); Mills Dep. at 29-30, 56, 87-94 (could review time on ADP and Paycom; could email supervisors or use form to correct time entries; would notify her supervisor and request for her time to be adjusted if computer was slow and it took more than 5 minutes to clock in or if similar problems at end of her shift; supervisors encouraged call center employees to review and correct their time so they would be paid properly[19]); Alford Dep. at 46-50 (would request time corrections from a lead or IT staff memberif she had problems logging in; also used punch claim forms); Saxton Dep. at 77-79, 86 (could review recorded time in system; would use punch claim log or email supervisor to correct time if there was an issue with computer or prevented from clocking in on time); Ortiz Dep. at 41-42 (was instructed to contact supervisor if he missed a punch or unable to log in promptly).[20]

Considering this voluminous testimony on the existence of multiple avenues to correct time entries and get paid correctly in the event of computer delays, no reasonable trier of fact could

[19] In her discovery responses, Mills claimed that supervisors did not correct her hours; at her deposition, she testified she did not know whether they corrected her hours. Mills Dep. at 134-35.
[20] *But see* Giraldo Dep. at 36-38, 63-64 (knew there was a process to fill out a form and adjust time if computer was not working or unable to clock in; but, unlike others, she was not aware she could use this process for computer delays).

conclude that there was an unwritten, Department-wide policy that prevents employees at the Call Center from getting paid for computer delays associated with booting up and booting down. As in the *Campbell* case, Plaintiffs cannot prove a "uniform policy." At most, they might establish "variable practices variably applied." 903 F.3d at 1120-21. Consequently, they are not similarly situated, and the collective action must be decertified. *Id.*

### E.  Other Individualized Issues

#### 1.  *Some Plaintiffs Were Responsible for Enforcing the Timekeeping Policy.*

Most Plaintiffs were call center agents, but some were supervisors and responsible for implementing Connexx's attendance and timekeeping policies. Rossalind Saxton supervised QA agents, dispatch agents, and customer service agents. Saxton Dep. at 12-14, 17-18. Her duties included supervising and training agents with respect to attendance and timekeeping, including Connexx's policy against working off the clock. *Id.* at 19-20, 23, 25-26, 99, 108. She occasionally made corrections in the timekeeping system when employees submitted punch claim forms. *Id.* at 24. She was also responsible for creating training on boot-up and log-in procedures for Call Center employees. Kamaka Dep at 19-20. Kenya Mills was a lead and supervised agents during part of her employment. Mills Dep. at 11, 15. Her duties included making sure that agents were clocked in while working. *Id.* at 16-17. Danielle Curley and Richard Ortiz were also leads for a time. Curley Dep. at 36-37; Ortiz Dep. at 25. Many Plaintiffs testified they would report to their leads when they needed to adjust their time because of a delayed log in or other issues. *See supra* Section IV.D. Cariene Cadena, a supervisor herself, was supervised by Saxton and would ask Saxton to correct her time if there was a delayed clock in. Cariene Cadena Dep. at 41-42, 62-64.

Supervisors and subordinates are not similarly situated in this case. Collective action certification is inappropriate where some members of the collective action supervised other

members and were responsible for ensuring that they were paid correctly under the FLSA or company policies. *See Bentley v. Cty. of L.A.,* 2009 U.S. Dist. LEXIS 135766, at \*7-8 (C.D. Cal. Sep. 15, 2009); *Ellerd v. Cty. of L.A.,* 2009 U.S. Dist. LEXIS 36865, at \*13-14 (C.D. Cal. Apr. 9, 2009); *White v. Osmose, Inc.,* 204 F. Supp. 2d 1309, 1315 (M.D. Ala. 2002).

### 2.   *Some Plaintiffs Worked Less Than Forty Hours Per Week.*

If Plaintiffs worked less than 40 hours in a particular week, then Defendants have no FLSA liability for those weeks. *See Sargent v. HG Staffing, LLC,* 171 F. Supp. 3d 1063, 1077 (D. Nev. 2016). Judith Cummings only worked part-time, which was 24-30 hours per week. Cummings Dep. at 42-43. Brandon Cadena only worked about 38 hours per week. Brandon Cadena Dep. at 30, 61, 64-65. Even if they worked off-the-clock 20 minutes per day for five days (100 extra minutes per week), neither would exceed 40 hours per week. Other employees testified they worked 8 hours per day and 5 days per week, in which case unpaid, compensable off-the-clock time would exceed 40 hours per week and qualify for overtime. However, this type of testimony depends on individual evidence. For example, the Named Plaintiffs assert they worked at least 5 shifts per week and 8 hours per day, Am. Compl. ¶16, but a week-by-week review of Cariene Cadena's time records show she worked 5 days per week only 55% of her workweeks. *See* Exhibit O, Stuckwisch Report ¶¶55-58. In contrast, Andrew Gonzales worked 5 days per week 76% of workweeks. *Id.* Determining the veracity of each Plaintiff's testimony regarding their schedule and whether they exceeded 40 hours per week will require week-by-week review of each Plaintiff's time records and the outcomes will vary from person to person and from week to week. Thus, Plaintiffs are not similarly situated with respect the baseline issue of whether they even incurred overtime.

## V.   CONCLUSION

For all the above reasons, Defendants request that the Court grant this Motion, decertify

the collective action, and dismiss without prejudice the FLSA claims of the Opt-in Plaintiffs.

Submitted this 27th day of October, 2020.

/s/  *Veronica von Grabow*
Paul T. Trimmer
Nevada State Bar No. 9291
JACKSON LEWIS, P.C.
3800 Howard Hughes Pkwy., Suite 600
Las Vegas, NV 89169
(702) 921-2460
trimmerp@jacksonlewis.com

Veronica T. von Grabow
*Admitted pro hac vice*
950 17th Street, Suite 2600
Denver, CO 80202
(303) 225-2419
veronica.vongrabow@jacksonlewis.com

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I certify that on October 27, 2020 a copy of the foregoing was filed with the Court's

CM/ECF system, which electronically sends notice to the following counsel of record:

Mark R. Theirman, Esq.
Joshua D. Buck, Esq.
Leah L.  Jones, Esq.
THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511

*Attorneys for Plaintiff Danielle Curley*

/s/ Veronica von Grabow

Veronica von Grabow

4849-7480-7760, v. 1

DEFENDANT'S MOTION FOR DECERTIFICATION AND SUPPORTING MEMORANDUM – 26